# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WILLIE PRESTON and BRITTANY BAILEY, ) ) ) Plaintiffs, ) ) v. ) ) THE BOARD OF TRUSTEES OF ) CHICAGO STATE UNIVERSITY, et al., ) ) Defendants. ) | Case No. 14 CV 3423 <br><br> Judge Joan B. Gottschall |

## MEMORANDUM OPINION & ORDER

In 2013, plaintiffs Willie Preston ("Preston") and Brittany Bailey ("Bailey") (collectively, "Plaintiffs") were students of Chicago State University ("CSU"). Both became involved in the Student Government Association ("SGA") and ran on platforms criticizing CSU administrators' handling of student affairs. But then the events giving rise to this lawsuit occurred: Preston was expelled, and CSU allegedly not only invalidated an election that Bailey had won, but interfered with her campaign in a subsequent election to insure her defeat.

Plaintiffs brought this suit on May 12, 2014, alleging, *inter alia*, that the defendants (collectively referred to as "Defendants" or "CSU") had retaliated against them for their criticism by expelling Preston and by preventing Bailey from taking SGA office. On March 22, 2015, Plaintiffs filed a motion for preliminary injunction, seeking an order that would require CSU to reinstate Preston and award both Preston and Bailey positions in student government.

For the reasons set forth herein, Plaintiffs' motion for preliminary injunction is denied.

## I. THE HEARING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Over a five-day period in June 2015, the court held an evidentiary hearing on Plaintiffs' motion for preliminary injunction. Five witnesses, including Preston and Bailey but none of the defendants, testified. On the final day of the hearing, the court asked the parties to submit proposed findings of fact and conclusions of law.

The court made this request because the record is rife with plots and subplots that have attenuated bearing on Plaintiffs' claims. Plaintiffs introduced evidence, including witness testimony and affidavits, to prove that CSU had retaliated against current and former professors after they had criticized the administration or took Plaintiffs' side. Plaintiffs' objective in introducing this evidence was to show that CSU engaged in a scheme of retaliating against teachers and students who criticized its administrators. But much of the testimony of Plaintiffs' witnesses foundered for lack of foundation, lack of foundation to be admissible under Federal Rule of Evidence 404(b), reliance on inadmissible hearsay, and irrelevance to Plaintiffs' claims. In the end, the court found Plaintiffs' presentation of evidence confusing.

Plaintiffs' proposed findings of fact and conclusions of law did not resolve the court's confusion. The findings of fact are replete with argument. And the conclusions of law do not articulate the specific claims Plaintiffs are pursuing, the factual bases for those claims, or the relationship between those claims and the injunctive relief Plaintiffs presently seek. As a result, the court was left on its own with the task of determining what Plaintiffs were trying to prove and whether they had proven anything at all.

## II. LEGAL STANDARD

Plaintiffs seek two remedies in their proposed findings of fact and conclusions of law: an order enjoining Defendants from (1) "[c]ontinuing to enforce Preston's October 2013, Expulsion

2

Order; and (2) [c]ontinuing to bar Plaintiffs from serving in the elected positions they won."
(ECF No. 121 at 53.)[1] Before the court can address whether Plaintiffs are entitled to this relief, it must determine the legal standard that applies to their motion, which depends on the nature of the injunctive relief at issue. Whereas Plaintiffs claim they are requesting a prohibitory injunction to preserve the status quo, Defendants argue that Plaintiffs are seeking an interlocutory mandatory injunction.

The court concurs with Defendants. In fact, all parties agreed at the beginning of the hearing that Plaintiffs were seeking mandatory injunctive relief. (*See* Hrg. Tr. 12:13-15 ("THE COURT: Okay. So everything you're asking for is in the form of a mandatory injunction actually. MS. KAPITAN: Exactly.")). Plaintiffs have since changed their position. Plaintiffs now phrase their requested remedies in terms of ordering Defendants "to cease" an activity. Nevertheless, in practice, implementing the relief Plaintiffs seek would necessitate affirmative action on CSU's part.

Preston, for example, seeks an order directing CSU "to cease" enforcing its expulsion order against him. But this is not a case in which a student was expelled just before an upcoming calendar year and seeks to prevent the expulsion order from going into effect. Rather, Preston was expelled in October 2013. He attended a different college last year. He now seeks reentry into CSU. The court thus would be forcing CSU to readmit him. Similarly, Bailey is seeking to be installed into a student government position which another student now occupies, the other student having won a subsequent student election. To grant Bailey's request, the court would

---

[1] Originally, Plaintiffs sought additional remedies in their motion for preliminary injunction, such as an order directing Chief Watson to direct CSU officers not to arrest Preston for being on CSU property. (*See* ECF No. 52.) The court, however, understands that Plaintiffs have abandoned their request for those remedies at this juncture by omitting them from their final request for relief. The court focuses only on the remedies Plaintiffs seek in their proposed findings of fact and conclusions of law.

have to order CSU to remove that student and replace him or her with Bailey. The same outcome would result if the court ordered CSU to install Preston into the student government position he seeks. Thus, both remedies at issue—reinstating Preston and reinstalling both Preston and Bailey into student government—are more properly understood as mandatory relief.

The difference between a mandatory injunction and a prohibitory injunction lies in the burden the movant must carry to obtain the injunction. Both types of an injunction require "a showing that: (1) the plaintiffs have suffered irreparable harm; (2) monetary damages are inadequate to remedy the injury; (3) an equitable remedy is warranted based on the balance of hardships between the plaintiffs and defendant; and (4) the public interest would be well served by the injunction." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011). But the "third part of this test—the balance of hardships—takes on heightened importance when the plaintiff requests a 'mandatory injunction,' that is, an injunction requiring the defendant to perform an affirmative act." *Id.* "A mandatory injunction imposes significant burdens on the defendant and requires careful consideration of the intrusiveness of the ordered act, as well as the difficulties that may be encountered in supervising the enjoined party's compliance with the court's order." *Id.*

## III.  DISCUSSION

Bearing in mind Plaintiffs' burden of proof, the court addresses whether Preston and Bailey are entitled to preliminary injunctive relief.[2]

### A. Preston

Plaintiffs have presented two theories of how CSU violated Preston's rights under the First Amendment. First, Plaintiffs claim that CSU retaliated against Preston by banning him from campus after he accused some of its administrators of being corrupt during an open house

---

[2] The court incorporates its findings of fact into its discussion of Plaintiffs' requested relief.

4

event for prospective students.  Second, Plaintiffs allege that CSU retaliated against Preston again by expelling him after he returned to campus, despite being banned, to criticize administrators at a public meeting.  Preston seeks an order directing CSU to lift its expulsion order that it entered against him on October 30, 2013.

The court finds that Preston is not entitled to this relief because Plaintiffs have not established irreparable harm.  Significantly, Preston did not move for a preliminary injunction until March 2015, approximately seventeen months after he was expelled in October 2013.  Plaintiffs provide no explanation for this delay.  In the court's view, Preston's delay in seeking injunctive relief is "circumstantial evidence that the potential harm to [him] is not irreparable or as great as claimed," *Fenje v. Feld*, No. 01-cv-9684, 2002 WL 1160158, at *2 (N.D. Ill. May 29, 2002) (citing *Ideal Industries, Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1025 (7th Cir.1979), *cert. denied,* 447 U.S. 924 (1980)), especially since Preston's expulsion did not prevent him from continuing his education: Preston is currently attending Roosevelt University and is a year away from graduating.

Preston argues that his expulsion from CSU has irreparably harmed him in other respects.  Preston asserts that his "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (Pls.' Br. at 46) (citing *Elrod v.* Burns, 427 U.S. 347, 373 (1976) (plurality opinion)).  Preston also argues that his expulsion prevents him from being a student activist at CSU, where he "feels he can have a bigger impact." (Pls.' Br. at 40.)  But Preston's delay in pursuing an injunction undermines the severity of these purported harms.  *See American Civil Liberties Union v. St. Charles*, 794 F.2d 265, 274 (7th Cir. 1986) ("political speech (such as involved in *Elrod*) often is addressed to transitory issues, and becomes stale when the issues pass away"); *Tarvin v. Bd. of Educ.*, No. 09-655, 2010 U.S. Dist. LEXIS 35220,

at *4 (S.D. Ill. Apr. 9, 2010) ("[T]he fact that Plaintiffs waited over three months to file their Motion for Preliminary Injunction, belies their argument that they were suffering the loss of First Amendment freedoms.")

Preston further argues that his expulsion has tarnished his reputation, which concerns him because he has "ambitions to be a part of the government in the future." (Pls.' Br. at 41.) But Plaintiffs provide the court with no authority that a student's ambitions in a particular future employment path warrant the entry of a mandatory interlocutory injunction. *See Ditton v. Rusch,* No. 14-cv-3260, 2014 WL 4435928, at *3 (N.D. Ill. Sept. 9, 2014) ("The threat of irreparable injury necessary to justify the extraordinary remedy of preliminary injunctive relief must be 'real,' 'substantial,' and 'immediate,' not speculative or conjectural.") (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983)). And should Preston prevail at trial, nothing would prevent the court from addressing his reputational concern by ordering CSU to amend his student record. *See Boucher v. School Bd.*, 134 F.3d 821, 827 n.6 (7th Cir. 1998). At this stage, however, Preston has not met his burden of establishing the requisite irreparable harm to justify an interlocutory injunction.

An alternative basis for denying Preston's request for immediate reinstatement is that he has failed to show a likelihood of success on the merits of his retaliation claims. "To make out a prima facie case of first amendment retaliation, [the plaintiff] must present evidence that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the [adverse] action." *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). "If the plaintiff[] makes this threshold showing, the burden then shifts to the defendants to produce evidence that they would" have carried out the adverse action "even in the absence" of the plaintiff's speech. *Id.* at 717. "In other words, the

defendant[] may show that retaliation was *not* the but-for cause for the [adverse action]." *Id.* If the defendant carries that burden, "the plaintiff[] then must persuade a fact-finder that the defendants' proffered reasons were pretextual and that retaliatory animus was the real reason" animating the adverse action. *Id.*

Here, Preston predicates his retaliation claim on two adverse actions he suffered: (i) his ban from campus, and (ii) his expulsion from the university. The court addresses each adverse action in turn.

### i. *Preston's Ban from Campus*

The evidence at the preliminary injunction hearing established that Preston came to campus and spoke to a group of prospective students at an open house event on October 14, 2013 while he was suspended. (*See* Direct Examination of Willie Preston, Hrg. Tr. at 90:25-91:17, 163:19-22.) Preston testified that he told the students that CSU was "a great university" but that it "ha[d] some corrupt people at the top of [the] university," including "the president and [Provost] Henderson." (*Id.* at 91:13-17.) When Preston made this comment, he "referenced to" Provost Henderson, who was standing nearby. (*Id.*) Preston testified that Provost Henderson reacted by conferring with CSU Vice President LaShondra Peebles, who also was in the vicinity at the time of the event. After Provost Henderson and Vice President Peebles exchanged words, they approached and directed Preston to go to the office of Anna Kent, who was serving as the Interim Director of Judicial Affairs. Preston testified that he thereafter went to Kent's office, where he received (1) a list of names of students who had claimed that Preston had threatened or harassed them in connection with recent student elections, and (2) a letter notifying him that he was thenceforth banned from campus. (*Id.* 163:19-164:9; *see also* Oct. 14, 2013 Letter, ECF No. 54-20.)

7

Preston's testimony as described above accords with the timeline CSU provides in its proposed findings of fact and with the declaration of Anna Kent, which Plaintiffs introduced into the record. Kent avers that in the days preceding the October 14, 2014 open house, she "came to learn that there were complaints about Willie Preston," composed an initial draft of a letter to Preston, and submitted it to Patrick Cage, CSU's General Counsel, and Robin Hawkins, one of Cage's direct reports in the General Counsel's office.[3] (Decl. of Anna Kent ¶ 2.) Cage and Hawkins revised Kent's draft by adding a section prohibiting Preston from being on campus. (*Id.* ¶ 4.) Cage directed Kent to sign the revised draft. (*Id.*)

Kent further averred that, "[s]hortly after the General Counsel's office sent [her] the revised letter," she attended the open house recruitment event during which Preston accused Provost Henderson of corruption. (Kent Decl. ¶ 5, ECF No. 103-1.) Kent recalls, at some point during the event, a staff member found her and indicated that Provost Henderson wanted her to serve the letter to Preston. She complied by serving a copy of the letter to Preston in the presence of a police officer, Vice President Peebles, and Anika Miller, secretary for Judicial Affairs. Although the top of the letter is dated October 11, 2013, Preston testified that he received it on October 14, 2013, and he dated his signature on the letter with the date, "October 14, 2013." (*See* Hrg. Tr. 163:19-15:8; ECF No. 54-20.)

This chronology undermines Preston's claim that he was banned from campus in retaliation for his speech at the open house event. It is undisputed that Kent, Cage, and Hawkins finalized the letter banning Preston *before* Preston attended the open house event on October 14, 2013.[4] Preston does not explain how CSU could have been motivated to ban him on or around

---

[3] The court does not find that Kent's "[coming] to learn that there were complaints about Willie Preston" establishes that Preston, in fact, threatened or harassed any students.
[4] During closing arguments, CSU's counsel indicated that CSU produced in discovery an email that Kent wrote before October 14, 2013, in which she declared her intention to serve Preston

8

October 11, 2013, when it finalized the letter, by the accusations of corruption Preston made on October 14, 2013. Preston thus fails to establish a likelihood of prevailing on his first retaliation claim based on his ban from campus. *See Norton v. Town of Brookhaven*, 33 F. Supp. 3d 215, 235 (E.D.N.Y. 2014) ("although plaintiff's burden in establishing a *prima facie* case of [First Amendment] retaliation is 'a light one'[,] it still requires that 'the protected activity precede[ ] the adverse action in order to satisfy the causation requirement'") (quoting *Raniola v. Bratton,* 243 F.3d 610, 624 (2d Cir.2001)).

Separate from his retaliation claim, Preston challenges CSU's decision to ban him on the ground that he sought, but was denied, a disciplinary hearing before the ban took effect. Essentially, Preston raises the claim he pleads in Count III of the Amended Complaint for a violation of his procedural due process rights under the Fourteen Amendment. (*See* Am. Compl. ¶¶ 131-143, ECF No. 33.) To establish a procedural due process claim, a plaintiff must "show (1) that he was deprived of a protected liberty or property interest, and (2) that he did not receive the process that was due to justify the deprivation of that interest." *Armato v. Grounds*, 766 F.3d 713, 721-22 (7th Cir. 2014). "Accordingly, a plaintiff asserting a procedural due process claim must have a protected property interest in that which he claims to have been denied without due process." *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010).

Here, although Preston argues that he was deprived of his right to access campus, and that he was denied a hearing on the deprivation of that interest, he failed to address the question of what protectable property interest he had in accessing campus for non-academic purposes. This question is not straightforward. A property interest based on an independent source of law

---

with the letter the next time he came on campus. Although CSU did not cite this email in its proposed findings of fact, the document would corroborate CSU's position that it decided to ban Preston from campus before he returned to campus and accused Provost Henderson of corruption on October 14, 2013.

must be identified, and the alleged deprivation must be shown to violate federal law. *See Bartlett v. City of Chicago Sch. Dist. #299,* 40 F. Supp. 3d 959, 964 (N.D. Ill. 2014) ("Property interests are not created by the United States Constitution; '[r]ather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'") (quoting *Moore v. Muncie Police and Fire Merit Com'n,* 312 F.3d 322, 326 (7th Cir.2002)); *and Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) ("As we tirelessly but unavailingly remind counsel in this court, a violation of state law (for purposes of this case the student judicial code may be treated as a state law) is not a denial of due process, even if the state law confers a procedural right. . . . The standard of due process is federal.") (citations omitted). Preston makes no effort to identify the protected property interest that entitles him to a hearing, and he provided no argument on this subject. As a consequence, the court cannot find that he demonstrated a likelihood of success on the merits of his procedural due process claim arising from his ban.

    ii. *Preston's Expulsion*

Preston argues that CSU expelled him in retaliation for critical comments he made during a public meeting that the Illinois Board for Higher Education ("IBHE") held on CSU campus on October 18, 2013. As previously discussed, Preston was banned from campus as of October 14, 2013, except for visits strictly related to academic purposes and subject to certain conditions. Specifically, the terms of Preston's ban were that he:

1) could set foot on campus only to attend pre-scheduled meetings with an academic advisor or to access the Registrar's office, Financial Aid, or the Bursar's office;

2) was required to contact the Office of Judicial Affairs before making an academic visit;

10

3) was required to check in with the University Police Department upon entering campus; and

4) was required to check out with the University Police Department upon departing campus.

(*See* ECF No. 54-20). CSU informed Preston in the October 14, 2014 letter that Kent served on him that it would consider his entry upon campus and failure to comply with the conditions of his ban as constituting "Criminal Trespass on State Property." (*Id.*)

Notwithstanding the terms of his ban, Preston went to the IBHE meeting, did not contact the Office of Judicial Affairs ahead of time, and did not check in with the University Police Department upon entering campus. Once at the IBHE meeting, Preston stood up at some point and aired his views that the CSU administration was corrupt. The chair of the meeting responded by asking Preston to stop speaking and telling him that his comments were out of line. Preston apologized and left the meeting.

What unfolded next is in dispute. Preston testified that Provost Henderson followed him as he left the room and asked to speak with him. (Hrg. Tr. 98:14-18.) He further testified that he told her that he did not "have anything to say to [her]," as they were entering an elevator together. (*Id.*) When the elevator doors opened, Preston saw several police officers entering the building. (*Id.* 98:19-24.) Preston spoke with one of them, who then struck up a conversation with Provost Henderson. (*Id.*) Moments later, that same officer received a phone call on her cell phone, turned to Preston, and informed the other officers in the area that they had to arrest Preston. The officers escorted Preston to a police vehicle outside the building and took him to the CSU police station, where he was arrested for "Criminal Trespass to State Supported Land." (*See* Arrest Report, ECF No. 65-8 at 3.)

Provost Henderson was deposed on June 9, 2015 and offered a different account of her encounter with Preston. She testified that, after she met Preston in the hallway, he told her, "you

11

better be careful." (Dep. of Angela Henderson 16:24-17:4, ECF No. 111-5.)  It is undisputed that no other witness or declarant heard Preston say these words to Provost Henderson.  On October 22, 2013, she sought and obtained a restraining order against Preston in the Circuit Court of Cook County, Illinois. (*See* ECF No. 65-8 at 6-9.)  The restraining order was eventually vacated on the ground that the petition had "insufficient allegations . . . to warrant the issuance of the order." (*See* Dec. 19, 2014 Order, ECF No. 122-1 at 489.)

Regardless of what transpired between Preston and Provost Henderson, the charge for which he received notice of potential discipline was "Criminal Trespass to State Support [sic] Land"—not his alleged verbal assault of Provost Henderson. (*See* Notice of Charges/Preliminary Hearing Date, ECF No. 65-8 at 2.)  Preston received a preliminary hearing on his disciplinary charge but was unable to attend due to a scheduling conflict.  On October 23, 2013, Janelle Carter, Kent's successor as Interim Director of Judicial Affairs and a non-party to this case, sent Preston a notice that he would receive a Full Board Hearing on October 28, 2013.  Carter then presided over the Full Board Hearing.  None of the defendants sat on the hearing panel.  Preston moved to strike a student from the hearing panel, and his motion was granted.  Preston spoke on his own behalf.  None of the individual defendants, other than Provost Henderson, testified at the hearing. Preston's request to cross-examine her was denied.[5]

---

[5] Plaintiffs do not argue that the Full Board's denial of Preston's request to cross examine Provost Henderson deprived him of a procedural due process right.  Nor did Plaintiffs present any authority that would suggest Preston had a right to cross-examine any of the witnesses who testified at his expulsion hearing.  *See Larry v. Lawler*, 605 F.2d 954, 962 (7th Cir. 1978) ("In reaching the ultimate balance leading to a determination of what process is due, it is helpful to examine the procedural safeguards called for in similar circumstances involving protected rights.") (citing *Goss v. Lopez*, 419 U.S. 565, 583 (1975)) ("stop[ping] short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge"); *Brown v. Plainfield Cmty. Consol. Dist. 202*, 522 F. Supp. 2d 1068, 1074-75 (N.D. Ill. 2007) (applying factors from *Mathews v. Eldridge*, 424 U.S. 319, 335

The hearing panel recommended the sanction of expulsion based on findings that (1) Preston committed Criminal Trespass to State Supported Land, (2) Preston made an "unauthorized entrance into or use of the University Facilities" while being suspended, and (3) Preston's "actions were in contravention of the values set forth in the University's *Code of Excellence*" and Code of Conduct. (ECF Nos. 54-24, 65-8.)

Preston does not dispute the Full Board's finding that he violated the terms of his suspension.[6] (*See* Judicial Hearing Decision Form, ECF No. 65-8 at 11) (suggesting the sanction of expulsion based on the finding that Preston was responsible for "Criminal Trespass to State Support [sic] Land"). Preston testified that he entered campus on October 18, 2013 to attend the IBHE meeting, and that prior to the meeting, he neither contacted the Office of Judicial Affairs to request permission nor checked in with the university police department. (*See* Hrg. Tr. 166:8-

---

(1976) to determine whether a student was denied a fair expulsion hearing because he "was not permitted to cross-examine the unnamed students who submitted witness statements").

[6] The court fails to understand the distinction between the first and second grounds for expelling Preston. In the October 14, 2013 letter that Kent served on Preston, CSU notified him that it would consider any violation of the terms of his ban from campus "to constitute Criminal Trespass on State Property." (ECF No. 54-20.) However, the actual crime, "Criminal Trespass to State Supported Land," is defined by statute. *See* 720 ILCS 5/21-5(a) ("A person commits criminal trespass to State supported land when he or she enters upon land supported in whole or in part with State funds, or federal funds administered or granted through State agencies or any building on the land, after receiving, prior to the entry, notice from the State or its representative that the entry is forbidden, or remains upon the land or in the building after receiving notice from the State or its representative to depart, *and who thereby interferes with another person's lawful use or enjoyment of the building or land*.") (emphasis added).

Plainly, the elements of the statutory crime differ from the terms of Preston's ban. Yet, none of the parties have attempted to reconcile the differences between the statute and the ban or explain why such differences would matter. The court makes this observation simply to note that it views the first and second grounds for Preston's expulsion—commission of "Criminal Trespass on State Property" and violation of the terms of Preston's ban— as essentially a single finding that Preston violated the terms of his ban. There is no evidence in the record to suggest that the Full Board assessed the elements of the state criminal statute and determined that Preston had violated it as well.

13

167:3.)  Therefore, based on the preliminary injunction record, the court finds that Preston has failed to show a likelihood of success in rebutting CSU's grounds for expelling him.

In Preston's defense, Plaintiffs argue that Preston believed he was allowed to enter campus because, prior to entering campus on October 18, 2013, he reviewed the Illinois Open Meetings Act, 720 ILCS 5/21-5, and determined that nothing in that statute precluded him from attending the public IBHE meeting.  Plaintiffs also cite *Putnam v. Keller*, 332 F.3d 541, 549 (8th Cir. 2003) in their proposed conclusions of law for the proposition that, "In order to ban [a member of the community] from the campus, the College officials must show that the restrictions are narrowly drawn to serve a compelling interest."  But Plaintiffs offer the court no guidance regarding how to reconcile the terms of Preston's ban with his rights under the Open Meetings Act.  Nor do Plaintiffs discuss whether CSU's ban of Preston was narrowly drawn or whether CSU had a compelling interest in prohibiting Preston from accessing campus other than for academic purposes.  With all of these questions unanswered, the court is in no position to grant Plaintiffs' request for mandatory injunctive relief at this stage.  *See United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (noting that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived" and that "[i]t is not the obligation of [a] court to research and construct the legal arguments open to parties, especially when they are represented by counsel") (internal quotation marks and citations omitted).

### B.  Preston's and Bailey's Request for Reinstatement in Student Government

Both Preston and Bailey claim that CSU removed them from their democratically-elected positions in student government in retaliation for their speech against the CSU administrator defendants.  Plaintiffs now seek reinstatement to those positions.

14

Preston's request fails in light of the court's ruling denying him reinstatement to the university. Plaintiffs do not dispute that Preston must be a student at CSU to be eligible to hold office in the CSU SGA. Because he remains a non-student, he is neither eligible nor entitled to the student government seat he requests.

As for Bailey, she seeks redress (1) for CSU's alleged refusal to place her in the student government position she won in spring 2013, SGA President, and (2) for CSU's alleged interference with her campaign in fall 2013 for student representative of the CSU Board of Trustees.

Even if Bailey's factual allegations were true, the court could not award her the relief she seeks because she has not identified any ongoing irreparable harm. *See Cantu Servs., Inc. v. Roberie*, 535 F. App'x 342, 344 (5th Cir. 2013) (differentiating between a "one-time, past event" and "an ongoing violation") (citing *Ex parte Young*, 209 U.S. 123 (1908)); *Ditton v. Rusch*, No. 14-cv-3260, 2014 WL 4435928, at *5 (N.D. Ill. Sept. 9, 2014) ("[I]n those cases where courts have found irreparable harm stemming from constitutional harm, the constitutional violations were ongoing.").

Bailey does not seek to bar CSU from prospectively interfering with future campaigns she might wage. Instead, she targets the 2013 election results—past events—and asks the court to place her in student government positions based on those results. But the harm Bailey experienced—not taking the seats she allegedly won or could have won in 2013—is now moot as a subject of potential injunctive relief. *See ARC Students for Liberty Campaign v. Los Rios Cmty. Coll. Dist.*, 732 F. Supp. 2d 1051, 1054 (E.D. Cal. 2010) ("Plaintiff sought preliminary injunctive relief to require the district to count the votes in the election and seat the student who obtained the most votes for the 2009–2010 school year term. That term has since passed. As

such, plaintiff's claim to seat the student who obtained the most votes in the April 2009 election is moot."). Absent an ongoing violation of Bailey's rights under the First Amendment, the court has no basis to enter an injunction in her favor.

## IV. CONCLUSION

For the reasons set forth herein, Plaintiffs' motion for preliminary injunction is denied. Plaintiffs' motion *in limine* to allow the introduction of comparator evidence is granted, in that the court considered all of the evidence presented at the preliminary injunction hearing in preparing this opinion. At the next status conference, set for November 6, 2015, the parties shall report on the status of defendant Angela Henderson's pending motion to quash.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: August 14, 2015